1942. If it pleases the court, Chris Corbelan on behalf of Spartan Concrete Products, LLC, the appellant in this matter. I'd like to reserve five minutes for rebuttal if I may. That'll be granted. In the briefing for this case, there's numerous issues addressed. I think for purposes of today's discussion, focusing on the issue of whether the appellant established the fact of damage in this case. The lower court ruled that there was insufficient evidence to find antitrust injury. We believe the lower court conflated two issues there. In the antitrust injury prong, there's the fact of damage and then there's this measure of damage. There's really two different inquiries there. One is, was in fact the plaintiff injured? And then the secondary inquiry, which is, in what amount? Certainly the first factor relates somewhat to causation. The evidence at trial, and it's important, obviously, this being an antitrust case, the market, I think it was well-established in the testimony that this is a very high-elasticity price market where price was extremely sensitive. There were... Wasn't the district court troubled by the fact that Mr. Petey's testimony was just too conclusory? The court did have the trouble. I don't think it related to the elasticity of price in the retail ready-mix concrete market. I think most all of the witnesses testified that price was the main factor that customers chose who to buy the ready-mix concrete from. And so, at least with this regard, in establishing that we had a market that was very sensitive on price, we believe that part was established. The next part of proving the fact of damages was that there was a price war. So not only was the market extremely sensitive... It was started by your client, admitted by your witnesses. And indeed... I thought that was curious. I can't remember ever seeing a case where your own witness admitted that you began the price war. And to enter the market, it's true. It was a monopoly market. The price was extremely high on St. Thomas, and that was the testimony. And Spartan came in and competed with a monopolist supplier in the retail concrete market, and their price dropped dramatically. I think this is something that you would see in most monopolies. The price tends to rise. And here we had a competitor that came in to try to compete, and the prices dropped. So, yes, to gain market share, certainly Spartan came in, offered lower prices, and there was a vicious price war. The volume discount preceded the price war, right? The volume discount is sort of a misnomer, really. When there was one competitor, there was no particular discount. It was a price. They just got the price that they got. And when Spartan entered, Spartan was charged essentially more than its competitor heavy materials. It was related to volume, wasn't it? It was essentially related to volume, yes. But when there was only one competitor, there was no one getting a cheaper price. There was just one price. Once you had a second competitor, the supplier offered the volume discount, correct? I guess we never really understood exactly how it came about, other than the admission that the price had been charged the entire time that Spartan entered the market. Spartan was charged 10% more. Can I ask you, what direct evidence in this case shows that your adversary's price discrimination affected your concrete prices? It affected our prices? Yes. Well, I think the evidence was that it affected the price war and that this price discrimination came in and they're competing on price. And it injured Spartan because, in effect, if the main point of competition is price and the supplier is assisting, aiding one of the competitors in the cost of products, I think there can be no other conclusion that, in fact, Spartan was harmed by the price discount. It was, we believe, an illegal discount. That was established. And if we were seeking injunctive relief, we would have got it. Had we known at the outset, in day one, that they were getting this illegal price discrimination, and I was standing before you arguing a case with regard to an injunctive relief, I think that would have been a no-brainer. How do we know the volume discount was illegal? Your Honor, I believe that the first three elements of this case have been established in that there were competing products that had price discrimination from a single supplier, and the market consisted of only two competitors. And there was no demonstration that there was some substitutable product that could come in. And so we had a unique situation, I think, in these days of finding this type of market. I'm just trying to get to how it's illegal. Don't you need all prongs for it to be illegal? I mean, price discrimination is ubiquitous, right? It's just sort of law of supply and demand. If a manufacturer is producing something, they'll typically offer it at a lower price to somebody that buys a million pieces as opposed to someone that buys ten, right? That's not illegal, is it? No, Your Honor. It would not be, depending on the circumstances, certainly the element of damage is not required to show an illegal price discrimination. You don't have to suffer damages to seek injunctive relief. Let me think about this injunctive relief. Hypothetically, if we had been in that posture, would you be arguing for injunctive relief saying you can't sell at different prices, you have to sell it to us at the same price? Yes, Your Honor. Certainly if they had a cost justification defense, which admittedly, if that was brought up, if they could show through specific evidence that there was a reason that bulk sales, for instance, were cheaper, there was one boat, instead of breaking it up into smaller packages or percentages, then they would have a defense. But absent a cost justification defense, it's our position that it was an illegal price discrimination, and there was no evidence of a cost justification defense in the case. At the end of the day, didn't you just have a failure proof? I mean, reading the transcript, it was striking that you just didn't have any sort of hard evidence that showed what jobs you lost as a result of the price differential, right? I mean, I kept waiting to see customers X, Y, and Z come forward and say, well, we would have liked to have done business with Spartan, and we would have done business with Spartan, but we didn't, and here's the reason why. I mean, there wasn't any of that, was there? Your Honor, we don't believe that it was necessary or the law requires that you show customers coming in. We had six witnesses, at least five of which testified that customers made their decision based on price and that they would lose jobs based on price. Right, but which customers and how much money? I mean, you've got to prove up your case, and to put a damages number on the board, for example, you need to show how many jobs were lost and what the value of those jobs were, didn't you? To prove the measure of damages, I agree, that's an issue. With regard to measure of damages, if you showed, hey, we lost 100 sales because of price, and then we could calculate out maybe our lost profits on that, and that would be our damage. But I don't think it's the only way that you have to show damages. I think that you could show or measure your damages in any of the ways available to a normal litigant. What specifically did you show? I think the damages that we showed were that the company had engaged in three years of this price war, and it had sustained losses and had to close its doors. And basically at the end of the day, the P&Ls showed how much it had lost. The losses, as I understood it, were not through a lot of costs involved in the business, and the losses were not all tethered to the cost of the cement. Well, I think the loss from the price war, certainly there was a number of costs, aggregate and other parts to the product. But the cost, the discrimination added the extra feature to this price war. It was fuel for the fire of the price war, and it helped heavy materials continue their competition in the price war because they knew they were getting a special discount. Let me ask you real quickly about your other claim, the failure to amend, the permission to amend the complaint. Did your client have clean hands in that arraignment? Your Honor, we attached all the e-mails and everything we got from that last production, and that was the entire basis for our motion to amend for the civil conspiracy and interference with business. But I think Judge Restrepo is asking, I mean, wasn't your client partially responsible for the delays in discovery? I don't believe so. We attempted to take the deposition. I apologize if I misunderstood your question. We attempted to take the depositions. We attempted to get answers to our discovery. There were delays along the way. We tried to work through them informally, and if there was a punishment to be had, I think the punishment would have been we weren't entitled to any more discovery on the issue. We couldn't ask for more e-mails on the issue. But we should have been allowed to amend based on the facts discovered during the discovery process. I believe that was the correct answer, not denial. Should we take into consideration that you were bringing in a new party? We weren't, Your Honor. You weren't bringing in a new party? No, Your Honor. Although we alleged conspiracy with heavy materials, we didn't bring heavy materials in as a party. That was not a part of the amendment. All right. Thank you, counsel. Thank you. May it please the Court. I'm Howard Feller, representing Argos USVI Corporation. Spartan claims that the cement price difference led to a price war, which drove it out of business in St. Thomas, and that this cost difference caused every dollar of its losses while it operated there. But that's not what the evidence showed. The real story was that from the first day Spartan started operating in St. Thomas, it competed aggressively by offering lower prices than heavy materials, concrete prices, and its pricing strategy had nothing to do with the cement costs. Spartan admitted that the cement cost difference did not prevent Spartan from competing successfully on concrete prices with heavy materials, from taking a business away and gaining market share, or from increasing its sales significantly. Spartan also didn't set its prices based on the cement costs. Instead, Spartan set its prices to undercut heavy materials, and it purposely sold at below-cost prices in an effort to force heavy materials to either sell its business or get out of concrete. So Spartan consistently charged lower prices than heavy materials, even if it meant sustaining losses by selling at below-cost prices. Spartan's minority owner, Mr. Bresci, testified that Spartan's majority owner said he was willing to spend millions to break heavy materials, and he was willing to spend millions to finance their losses so they could break heavy materials, which led to that price war. Mr. Mosler's plan was that Spartan's below-cost pricing would eventually pay off when Spartan would recoup its losses. So Spartan's pattern of consistently offering lower prices than heavy materials and selling at below-cost prices worked, in that it forced heavy materials to the bargaining table, but it caused Spartan to lose money every year. Eventually, Spartan got what it wanted when heavy materials agreed to stop competing and divide up the market, with Spartan taking St. Croix and heavy materials taking St. Thomas. Mr. Mosler explained that he was able to get St. Croix with good prices, and then Spartan raised prices immediately in St. Croix after they signed the agreement. When did this price differential begin? It started on the first day of operations. Was it tethered to the volume discount? Yes, Your Honor, it was. The evidence was that in any given year, heavy materials purchased between 5 and 15 times greater volume than Spartan. So we're not talking about a minor difference in volume. This was a huge difference in volume being purchased. So Spartan wasn't driven from the market. It voluntarily agreed to withdraw from the market so it could divide up the business with heavy materials. Mr. Keller, what's your response to Mr. Kroblin's argument that the illegality of the price discrimination was established and this is essentially a damages case? I would say that's totally incorrect. Why? Because we agreed that the same product was being sold at different prices, but we don't agree that it was illegal. They had to still prove competitive injury. And that's just on the Section 2A side of Robinson-Patman Act. In addition to prove damages under Clayton Act Section 4, they have to prove antitrust injury and a reliable measure of damages. All right, so let's start with the competitive injury. Why was there no competitive injury here? As the Court knows, there was an absence of any direct evidence of lost sales as a result of the cement cost difference. So what Spartan was relying upon is what they called a substantial price discrimination over time to get the Morton Salt inference that there was competitive injury here. But we know that the Morton Salt inference is a rebuttable inference and it can be rebutted and overcome by evidence that sales and profits are lost for other reasons that have nothing to do with the price discrimination. Is that what happened here? Yes, Your Honor, that is exactly what happened here. There was a substantial amount of undisputed evidence that Spartan lost sales and profits for other reasons that had nothing to do with the cement cost difference. There was testimony that customers decided to buy from Heavy Materials because it provided a better quality product, better service, greater reliability, had a larger fleet of trucks. It had specifications it had worked with clients on that Spartan didn't meet. And also a number of customers decided to buy from Heavy Materials out of loyalty even when Spartan was offering lower prices. So the evidence here rebutted and overcame that possible inference. Didn't price discrimination affect the price 100% of the time? It always did, didn't it? No, Your Honor, I wouldn't agree. I think the evidence here clearly showed that the cement cost difference, which was a tiny input cost in a manufacturing process, this was not distribution or sale at retail. This was a manufacturing cost. 1.3% of the actual cost, I think? That's correct, 1.3% of the total cost. And the evidence was that, as Mr. Peede admitted, the cement cost difference, as he said, did not prevent Spartan from successfully competing on prices. And he also admitted that Spartan had a competitive advantage. He said a competitive advantage over Heavy Materials because of its concrete prices. So the evidence was there was no impact or adverse effect from this tiny cost difference on Spartan's ability to compete on price. So the fact that there was competition over concrete prices is not the issue here. Yes, there was some competition over concrete prices, but there was also competition over a lot of other things, as I've just indicated. And in order to prove antitrust injury and causation, under Clayton Act Section 4, the plaintiff had to prove that there were direct evidence of lost sales and profits that resulted from the cement cost difference. There was no evidence whatsoever of that in this case. So I would submit to the court. What about the amendment? Leave to amend is liberally granted. They've got the email that came out that they think is somewhat of a smoking gun. Why shouldn't the court have allowed the amendment in light of the liberal standard? Well, I would suggest to the court there's two other opinions that really are at play here. It's the Lorenz case and the Currican case. And they say that prejudice to the other party is the touchstone of denial of a motion for leave to amend and that undue delay and unjustifiable delay and burden on the court are also grounds for denying leave to amend. So what happened here is when we had the hearing on the motion for leave to amend in February of 2017, the court indicated, the magistrate indicated, that she was going to deny the motion for leave to amend on prejudice and burden, but also on the grounds that the pleading itself didn't meet the Ashcroft-Tuomaly standards under 12b-6. So she said that at the hearing. Within two days, Spartan then tried to put in and slip in another amended complaint without doing it procedurally proper. But knowing that had happened, the magistrate, in her opinion, said that even if Spartan was able to cure its pleading deficiency, she was denying leave to amend on the standard grounds of undue prejudice to Argos, unjustifiable delay by Spartan, and undue burden on the court. We were in February of 2017 with dispositive motions due in less than two months, in April 2017, and then trial three months later. The court recognized that this motion for leave to amend would have caused that whole schedule to be put off. There had to be extra depositions taken, depositions retaken, new discovery taken, new briefing, new dispositive motions. So prejudice is really the reopening of the discovery? Yes, Your Honor, but it's a combination of that, of the burden of that, the cost of that, and delay that would be caused by all of that. And was there another party involved? Would heavy materials have been brought in at that point, or was there an interpleader situation? They wouldn't have been brought in by us, and I don't know what Spartan, they hadn't tried to do it at that time. But we're not adding another party, so we've got the same two parties. But all the depositions that had taken would have had to be retaken based on new issues that were not in the case. Well, I think Mr. Kroblin's response is, well, we didn't learn about this email where they said, you know, keep it confidential, don't tell anyone about the price discount. Had we known about it, we would have amended sooner. How could they be charged with not doing something they were unaware of, I guess? Well, what the court found is that way back in 2015, when this case got started and the status conference was being held, Spartan indicated that they needed to conduct discovery of heavy materials, and they would have to do that, it was required. But the court indicated they never did. They never took any discovery of heavy materials, never pursued that. So they didn't diligently pursue discovery, didn't complete discovery in a timely fashion, and violated five discovery orders of the court that were being set during that period of time. So they had the ability to try to find this evidence that they claim now is significant, but as the court said, they sat on their hands and didn't do anything to obtain that discovery. So we get to 2017, and they're arguing there should be new claims in the case when we've got dispositive motions coming in trial set three months after that. And so it was way too late, and it was prejudicial, because we'd have to retake all that discovery that would have to be completed, and then the costs of then preparing for a whole different set of issues. What about futility? Would you address that? The court said that the futility, although that didn't wind up being the basis for the decision, for the denial of the motion for leave to amend, it was prejudice, unjustifiable delay, and the burden on the court schedule. But what the court said is that under the Ashcroft and Twombly standards, the allegations were bare bones and just perfunctory, and basically reciting the elements of the claims without any facts. And that was exactly true. If you look at the draft of that amended complaint, there were no facts to support it. It was all conclusions. So that's what the court found. There was a pleading deficiency, but then it said, because they tried to slip in this new version within two days, and the court found that even if they cured their pleading deficiency, these other Lorenz and Curitin grounds applied and resulted in a denial of leave to amend. The one thing I'd like to come back to here is the key holding in this case, that there was a complete failure of proof as to antitrust injury and damages. There are two fatal flaws in Spartan's claims. The first is that they did not present any direct evidence whatsoever of any specific sales, jobs, customers, or profits which were lost as a result of the cement price difference. What is truly remarkable about this case is that Spartan did not present any customer testimony, any salesperson testimony, or any documents to identify a single lost sale, customer, or job that it claims was due to the cement price difference. The absence of any direct evidence through customer testimony or documentary evidence or salesperson testimony shows that there was no proof of actual causation with reasonable certainty. As this court found in the processed egg products case, I think it was in February of this year, that under Clayton Act Section 4, to recover damages and to prove antitrust injury, there has to be proof of actual causation with reasonable certainty. Here, the remarkable thing is there was a total absence of any direct evidence whatsoever from any source as to a single lost customer, sale, or job. Nothing. Mr. Petey testified. They relied solely on his testimony that he was assuming, and he was speculating, that this occurred. There was no direct evidence, and all they relied upon was Mr. Petey's admitted assumptions regarding this evidence. He admitted he didn't know why customers didn't buy from Spartan, and he admitted he was just assuming. The second fatal flaw is that there was a substantial amount of undisputed evidence that sales and profits were lost for other reasons that had nothing to do with cement cost or concrete prices. It was all these other factors that the parties competed with. Charge-offs were higher than the $180,000 in price differential, right? That's correct. One of sort of the most glaring on that? Correct, Your Honor. Almost two times higher. Bad debt write-offs where customers just didn't pay them. And then they obviously admitted they lost money every year because they were selling at below-cost prices. Nobody forced them to do that. That was an intentional pricing strategy to sell at below-cost prices. I guess one of your points that's worth considering is that just because they lost money or ran an unprofitable enterprise doesn't mean they weren't competing effectively in the market, I guess. Is that your point, that if they increase from nothing up to 30% or so of market share, that shows somebody that's competing pretty effectively? Your Honor, it also shows that the lack of the cement discount did not prevent Spartan from actually and aggressively competing on price. They said it did not prevent them from being successful on competing on price. And you say it doesn't matter that they were losing money hand over fist while they were doing that. It's not a result of the cement price difference. That was their intentional price. Because it was only 1.3% of total cost. Correct. And again, this was a manufacturing enterprise where cement just represented a small part of their cost to begin with. But the real key point here is that as this Court knows, the Supreme Court in this circuit has said repeatedly that under Clayton Act Section 4, a plaintiff can't recover for losses that are attributable to other causes. And what Spartan has said here is that all of its losses were caused by the cement price difference. And we know that's not true because the evidence was completely to the contrary and showed other reasons why it lost sales and profits. But what it's trying to do here is recover $3.8 million of all of its losses over those four years and say it was due to the cement price difference. And as a matter of law under Truett Payne and decisions of this Court, J.F. Fieser among others and Stellwagen, it can't do that. And I guess my time is up so the last point I'll make is I think this Court is exactly the same thing as what happened in Stellwagen where the Court found there was a lack of documentary evidence of any proof that the price discrimination resulted in lost sales and there was not one single customer identified in that case. That's exactly what happened here. So thank you, Your Honors. Thank you, Counsel. Mr. Crowman, could you begin where we ended with Mr. Feller? I'm interested in this notion that the ability to compete is unrelated to your bottom line. In other words, should we measure your client's ability to compete based upon the fact that it got a pretty substantial market share pretty quickly and look at that independent of its profit and loss calculation? Or are you arguing that your client's bottom line is definitive about its ability to compete? It's a complicated question. And I think the issue is how much funding did we have coming into the market? We came into a monopoly market, which is the problem. And we needed to come in and so, of course, we're going to suffer some losses. It is our theory of the case that had we been able to compete without some sort of market distortion that gave our competitor a better price on products, that the price floor would have subsided and we would have then come into some sort of balance step. Whether we had 30 percent of the market or 50 percent of the market, there would have been an equilibrium achieved. And so it's our position that the price floor continued because of this agreed to secret price discrimination. I'm not sure you answered my question respectfully. Do we measure your client's ability to compete based upon your bottom line or based on market share or something else? To me, I think on one level, I think Mr. Feller makes a point worth considering that when someone shows up, new entrant in the market has zero market share on day one and relatively quickly gets up to 30 percent market share, that looks a lot like someone that's competing very effectively in that market. I don't believe that an inability to compete is necessarily a touchstone for whether or not you're entitled to antitrust damages. You could still be competitive for other reasons, but if you are suffering some damages, the law, I think, is clear. It's the extent of those damages caused by the illegal price discrimination is what you're entitled to. And it doesn't matter whether or not you're competitive in the market or not competitive in the market. You're just entitled to the damages that are caused by the illegal price discrimination. And that, I believe, is the law. Let me go back to this lack of proof that Mr. Feller argued and that the district court referenced. What specific evidence in this record can you point to to identify lost customers, other than Mr. Petey's conclusions? Okay, so there was a focus that we didn't have any sales personnel or lost customers testify. I mean, this is a small operation. We had testimony from personal. So the answer is there's no such testimony on the record? No, the answer is not that. We didn't have a big sales force. We had a small group of people, and the managers of the company were intimately involved in the sales. Mr. Petey testified that he was involved in somewhere in the ordinance of 60 percent of all the sales, and that 90 percent of the time in those sales, the price was the main issue. Curt Nose, who was also involved in sales, testified that price was the main issue. Roger Brezzi, who was also involved in sales and ran the company for a time, testified that price was the issue. Are any of the customers in, potential customers in? We did not. I mean, there was thousands of customers, and so we did not feel that one or two or ten customers would be anything other than anecdotal evidence. Well, our Stellwagen case, I mean, not even bringing one? And, Your Honor, I- Anecdotal evidence is still better than no evidence. I think we had plenty of evidence. We had testimony from people intimately involved in all the sales. Stellwagen case was an evidentiary case. The courts, the party came in and said, here's our evidence. It's these lost sales. The court then ruled that was inadmissible evidence, and then the court found since you don't have any other evidence, there is, you know, we're throwing the case out. So, you know, I don't know how that informs this case, because we do have evidence in this case. We have the testimony of numerous individuals who testified about- You've got price is all that matters in this. This is a commodity, and price is all that matters. You've got that in spades, right? Yes. But beyond that- Well, Your Honor, I think we've got the fact of injury. We've shown that this is a price-sensitive market. We've shown there was price discrimination. And the fact of injury is that your client had to exit the market, wasn't making-lost a lot of money here. But they were overcharged for a product input. They were overcharged $180,000. That's correct. And their charge-offs were almost double that. And, Your Honor, there was no testimony- Look, if they don't charge off those accounts, if they collect those accounts, they're, you know, $160,000, $180,000 to the good. Every company has charge-offs. There was no testimony that our charges were somehow higher than another company's charge-offs. And without that, I don't think you can just look at a raw number and say, oh, these charge-offs are-you know, they were the cause. I mean, what is the percentage for a normal company to write off debt? There was no testimony. All right. Thank you, counsel. Thank you. We thank both counsel for their excellent arguments and briefing. We'll take the case under advisement.